# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

**RONALD LAFFOON, JR.,**

      **Plaintiff,**

**v.**                                           **Case No. 5:13cv31/RS/CJK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,[1]**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

Upon review of the record before this court, I conclude that the Administrative Law Judge's ("ALJ") decision was not based upon substantial evidence. The decision

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she is substituted as the defendant in this case.

of the Commissioner, therefore, should be remanded to the ALJ for additional proceedings consistent with this Report and Recommendation.

## PROCEDURAL HISTORY

Claimant Ronald Laffoon, Jr., who will be referred to by name, as plaintiff, or as claimant, filed his application for Disability Insurance Benefits ("DIB") on April 14, 2009, alleging disability beginning on April 1, 2009. T. 20.[2] Plaintiff's claim initially was denied and, upon reconsideration, the denial was upheld. Mr. Laffoon appeared before an Administrative Law Judge ("ALJ") for a hearing on July 15, 2010, and again on December 7, 2010. The ALJ likewise denied benefits. Claimant petitioned the Appeals Council of the Social Security Administration for a review of the ALJ's decision. The Appeals Council denied claimant's request for further review; as a result, the ALJ's decision became the final determination of the Commissioner. T. 1.

## FINDINGS OF THE ALJ

In his written decision the ALJ made a number of findings relative to the issues raised in this appeal:

• Claimant has the following severe impairments: status post cervical fusion, obesity, Crohn's disease, and depression.

• Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] The administrative record, as filed by the Commissioner, consists of 20 volumes (docs. 8-1 through 9-10), and has 1260 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

• Claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that the claimant is limited to no more than occasional contact with people.

• Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.[4]

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

"[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[5] 20 CFR § 404.1545(1). The ALJ establishes residual

---

[4] Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However,

functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[6] As the Eleventh Circuit has explained,

> [i]n practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001); *see Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.

---

before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 404.1520(a)(4).

1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act'))."). Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[7]

Claimant testified at a vocational hearing on July 15, 2010. T. 98. He was forty-three years old at the time. Claimant explained that he enlisted in the Navy in 1984 and was discharged in December 2008. T. 108-09. When he first enlisted, he worked as an aviation coordinatesman; he then became a diver who did "hardcore salvage" and later supervised other divers as a "chief." T. 109-10. In 1995, claimant was injured while playing "donkey baseball" when the donkey he was riding rolled over onto him and herniated a disc in his neck. T. 112. Following the injury, claimant received annual "steroidal injections," which worked "completely fine." Later, while claimant was stationed in Okinawa, Japan, the Humvee in which he was riding flipped and caused "K bottles" to fly forward and slam into the back of his head and neck. T. 112. He was transferred back to the United States after the accident and placed in charge of the "scuba locker" for several months; he then was sent to "training and evaluation" and placed under "limited duty circumstances." T. 113-14. Plaintiff retired from the Navy as "totally disabled" at age forty-one. T. 287, 388-96.

---

[7] The recitation of the medical and historical facts of this case is based upon my independent review of the record.

While stationed in Okinawa, plaintiff began to suffer from severe stomach pain. He ultimately was diagnosed with Crohn's disease. According to the plaintiff's testimony, if he ate a meal, he would go to the bathroom and stay there "for up to an hour," returning every fifteen minutes. T. 117. He underwent neck fusion surgery in 2006. Following the surgery, his cervical pain "gradually" increased. T. 133. He testified that he could not sit at a desk and work at a computer or sit upright in a chair for longer than ten minutes. T. 135. He could stand for thirty minutes and lift five to seven pounds, but he was unable to go grocery shopping without taking a break. T. 135-37. He also could not drive because of the medications he was taking. T. 135-37. The claimant testified that, because of his limitations, he could not work an eight-to-five job in a department store watching a monitor. T. 135-37.

Plaintiff's Crohn's disease improved after he started receiving Remicade infusions every eight weeks and bothered him "maybe" once a week thereafter. T. 137-38. The neck pain, on the other hand, continued to bother him daily. In claimant's view, however, his primary problem was the side effects of the various medications he was prescribed, particularly morphine and oxycodone, which he claimed eroded his short-term memory.[8] T. 140.

The plaintiff described his daily activities. He testified that he would wake up in the morning and stand in the shower for forty-five minutes so the hot water could

---

[8] In addition to morphine and oxycodone, the plaintiff took Valium to help him sleep and Trazodone and Effexor as anti-depressants. T. 141. He continued to take Effexor despite the fact that it did nothing for him because he was afraid of having withdrawals.

For much of the hearing, the ALJ examined the plaintiff's extensive use of prescription medication to treat his pain. T. 117-33. The ALJ was particularly concerned with plaintiff's frequent visits to the emergency room and failure to seek treatment from his regular providers.

loosen the muscles in his back, allowing him to move.  T. 142.  After he showered, he would take his medication and walk to the living room, where he would sit for "pretty much . . . the whole day."  On a good day, he would help with his child's homework or do light chores around the house.  T. 142.

Vocational Expert Mansini also testified at the hearing.  T. 144.  Mansini classified plaintiff's former occupation of "Navy diver" as "heavy." T. 145.  The ALJ posed a hypothetical to Mansini, asking him to consider  "a younger individual with a highschool degree" who had taken "some online college courses [for which he] received credits . . . through the Navy system . . . ." T. 145.  The ALJ specified that the hypothetical individual had a history of semi-skilled through skilled past work and "could lift and carry no more than ten pounds" and "sit, stand and walk independently for less than two hours a day."  T. 146.  Mansini concluded that such an individual would be considered "less than sedentary" and would be precluded from "all work."  T. 146.  Mansini testified, however, that if the ALJ found the plaintiff capable of performing the full range of light work, the plaintiff would be capable of performing certain administrative jobs.  T. 146.  Following Mansini's testimony, the ALJ requested that plaintiff undergo orthopedic review in an effort to acquire more information concerning plaintiff's neck limitations and overall neurological condition.  T. 146, 149.

On December 7, 2010, claimant again appeared at a hearing before the ALJ at which Dr. Ghazi, an orthopedic surgeon working for the Department of Veterans Affairs ("VA"), and Vocational Expert Mark Katz testified.  T. 43-44.  Dr. Ghazi reviewed claimant's medical records and noted that claimant had a cervical spine fusion that generally was "successful."  T. 47.  Dr. Ghazi affirmed, however, that the

fusion would limit the motion of plaintiff's neck – in particular, plaintiff's ability to bend his neck so that he could pull up his pants. T. 72-73. Dr. Ghazi observed that claimant's medical records revealed no "persistence [sic] evidence" of nerve root compression but a "significant amount of gastrointenstinal issues," including Crohn's disease and gastroesophoageal reflux disease ("GERD"). T. 47-48. In Dr. Ghazi's opinion, the gastrointestinal issues "superceded" and "overwhelmed" claimant's orthopedic problems. T. 48. Dr. Ghazi charted "adequate" upper extremity function. T. 48. He was concerned about the amount of narcotic medication plaintiff was prescribed and opined, based upon the medical records, that there was no orthopedic basis for the claimant's complaints of pain.[9] T. 49-50, 70. Importantly, Dr. Ghazi limited his opinion to claimant's cervical spine and did not address the amount of medication that would be required to treat plaintiff's gastrointestinal problems. T. 54. After taking into consideration orthopedic and gastrointestinal issues, as well as psychological issues and the affects of prescription medication, Dr. Ghazi testified that the claimant would be unable to sustain full-time employment unless he were no longer sedated, in which case his ability to function from a cervical standpoint would improve. T. 56, 62.

---

[9] According to Dr. Ghazi, a spinal fusion typically alleviates pain of a discogenic nature. He also testified that he does not heavily medicate patients who have had successful surgery and adequate outcomes but that the VA has a "tendency to be lenient towards veterans when they complain bitterly" and over prescribe medications. T. 51.

## MEDICAL EVIDENCE[10]

After plaintiff returned from Okinawa, he continued to complain of neck pain. MRIs taken on June 13, 2005, evidenced cervical disc disease and mild cervical stenosis but no radiculopathy. T. 1041. An MRI of plaintiff's spine performed on November 10, 2006, showed degenerative disc disease at C4-5, C5-6, and C6-7 that was most severe at C5-6. T. 821. Dr. Keith Zwingelberg diagnosed degenerative changes of the cervical spine with disc bulges but no bilateral occipital headaches. On December 5, 2006, he performed a cervical discography at the C4-5, C5-6, and C6-7 levels.[11] T. 822-24. Following the discography, Dr. John Hill recommended, and plaintiff underwent, an anterior cervical fusion of the neck at the C5-6 and C6-7 levels. T. 821. Chest and neck x-rays on January 6, 2007, evidenced only minor post-operative changes. T. 420-22. A cervical MRI on September 17, 2009, evidenced mild disc degeneration at C3-4, with deformity of the right side of the thecal sac and at least mild narrowing of the right foramen caused by a combination of disc protrusion and spur. At C4-5, the study showed mild degeneration and a wide combination of disc protrusion and spur that extended close to the cord in the midline but was more prominent to either side, with moderate narrowing of both foramina and no posterior or spinal stenosis but a probability of mild narrowing of the right foramen at C6-7. T. 609.

---

[10] Although intended to be thorough and provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will focus on the evidence relevant to the arguments raised in the parties' briefs.

[11] A cervical discography is a diagnostic procedure used to assess whether disc structures are damaged.

On July 19, 2007, six months after the cervical fusion, Mr. Laffoon was admitted into drug rehabilitation at Twelve Oaks Treatment Center, where he was seen by Dr. Rick Beach. T. 972-80, 1157-1260. He underwent treatment for overuse of oxycodone, hydrocodone, Flexeril, and Ambien CR.[12] T. 1158. He reported that he consistently overused his medications and frequently ran out of them early. T. 1159. He had five days of detoxification and twenty-three days of partial in-patient care. T. 972. After several weeks in rehabilitation, Mr. Laffoon was able to play frisbee and admitted to feeling "the best he [had] in years." T. 1161. At that time, he believed his pain was adequately controlled by Buprenorphine. T. 1161. He was discharged with instructions to abstain from all mood-altering chemicals, maintain contact with a sponsor, and attend narcotics anonymous meetings three to five times a week. T. 972. Mr. Laffoon tested positive for marijuana in February 2009 despite averments that he had not used marijuana since he was fifteen. T. 464, 1189.

Neck and Back Pain

In August 2008, Dr. Stacey Newsom conducted a disability evaluation. T. 898. According to Dr. Newsom, claimant's shoulders had limited range of motion and mildly positive impingement signs, his left knee had chondromalacia and status post meniscus repair with residual scars, and the right knee recently had been repaired for a torn lateral meniscus. Dr. Newsom noted degenerative arthritis of the elbow joints and cervical spine, irritable bowel syndrome, and various other ailments. T. 898-909.

---

[12] The plaintiff underwent alcohol rehabilitation in 1989 but continued to consume alcohol as recently as 2006, although claiming not to drink. T. 860, 1159, 1189.

One month later, on September 30, 2008, claimant saw Dr. Robert Joseph at the Pain Clinic of Northwest Florida. Plaintiff reported that he had received "steroid injections" but that the injections "were no longer working." T. 457. He complained of "constant stabbing pain and pins and needles sensation in his neck, upper back, and scapula; and stabbing pain in his low back." T. 458. He indicated his pain was "intense," usually between a four and five out of ten, and made normal functions difficult. T. 458. On November 4, 2008, Dr. Joseph administered trigger point injections into the plaintiff's trapezius, levator scapulae, rhomboid, and splenius cervicis muscles, noting that plaintiff had "really horrible trigger points" which were "much worse than a typical patient." T. 456. Dr. Joseph also administered left cervical dorsal median branch blocks at C2-3, C3-4, and C4-5. T. 461. During a follow-up visit, plaintiff indicated that the injections "helped a little" but that the pain had returned. T. 455.

Mr. Laffoon was referred to a neurologist, Dr. E. Jacob, on August 20, 2009. Dr. Jacob indicated that Mr. Laffoon had "significantly reduced" sensation on the right side with midline spitting and was unable to tandem walk. Concerning the neck (cervical spine), Dr. Jacob noted limited flexion of ten degrees, limited extension of ten degrees, and lateral rotation of twenty to thirty degrees. According to Dr. Jacob, the plaintiff's lumbar and thoracic spine were normal, as were his knees. T. 861-62. The plaintiff's shoulders likewise were normal except for "abduction limited to 110 degrees." T. 861-62. Dr. Jacob diagnosed Crohn's disease, chronic neck and back pain, hypertension, and depression and noted that plaintiff was under the influence of Valium and "MS contin" (morphine sulfate) at the time of the examination. T. 862.

Dr. Jacob completed a Medical Source Statement of Ability to do Work-Related Activities on August 11, 2010, finding that plaintiff could occasionally lift and carry between eleven and twenty pounds, sit between thirty and sixty minutes at a time, stand for thirty minutes at a time, walk between ten and twenty minutes at a time, sit for four hours in an eight-hour work day, stand for one hour per eight-hour work day, walk for one hour in an eight-hour work day, and was limited to occasional postural activities. T. 854-59. Dr. Jacob cautioned after each finding that her assessments were affected by the side effects of plaintiff's medications. In fact, Dr. Jacob noted that plaintiff's various prescriptions and subjective symptoms impaired his ability to perform certain activities and indicated that plaintiff likely would not have any deficit or impairment if he was not under the influence of the various medications he was taking. T. 854, 856, 858.

Dr. Malathi Shroff examined plaintiff on November 2, 2009, and diagnosed a limited range of motion in the cervical spine with "moderately severe" functional loss due to pain."[13] Dr. Schroff also found degenerative spondylosis at the T12 and L1 levels with "minimal" functional loss due to pain and bilateral impingement syndrome in the shoulders with "moderate" functional loss due to pain. Dr. Shroff noted that plaintiff had bilateral knee surgeries – specifically, arthroscopic surgery on the right knee with "moderate" functional loss and incisional surgery on the left knee "for the history of meniscectomies" with "mild" functional loss. Plaintiff's left elbow had mildly limited range of motion with "mild" functional loss. T. 928. Dr. Schroff recorded plaintiff's drug regimen of morphine, Percocet, Tramadol, Flexeril,

---

[13] Dr. Shroff was not able to review plaintiff's medical records at the time of the evaluation.

and Valium.  T. 928.  Due to medical conditions and pain medication, Dr. Schroff determined plaintiff was "unable to be gainfully employed for either sedentary or physical employment . . . ."

On May 21, 2009, Donald Jay interviewed claimant telephonically.  Claimant reported he could drive, walk short distances, care for his personal hygiene, do light housekeeping, prepare his own meals, button his shirt and pants, and tie his shoes. T. 308, 310, 355.  Plaintiff also said he had constant back, neck, and joint pain; weakness on his right side due to nerve damage; stomach pain from Crohn's disease; could stand for only five minutes; had difficulty lifting his hands; and needed to use the bathroom twelve to fifteen times a day because of diarrhea.  T. 309-10, 328, 355. Claimant's wife described his typical day as waking up and taking his medication, watching television, and taking additional medication before trying to go to bed.  T. 313, 327.  Claimant's wife also indicated that the claimant had difficulty standing, bending over, and lifting and described him as a "recluse," in constant pain and depressed because of his various medical conditions.  T. 315, 320, 324-25.

On July 23, 2009, Jay completed a Physical Residual Functional Capacity Assessment and determined plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and had no limitations on pushing or pulling.  T. 535.  Jay also believed plaintiff's symptoms were "disproportionate to the expected severity and duration that would be expected on the basis of the [plaintiff's] medically determinable impairments."  T. 539.

On October 23, 2009, Dr. Clarence Louis completed a Physical Residual Functional Capacity Assessment and determined that plaintiff was capable of lifting

and carrying ten pounds frequently and twenty pounds occasionally, standing and walking for six hours in an eight-hour workday, sitting for six hours in an eight-hour work day, and had no limitations on pushing or pulling. T. 601. Like Jay, Dr. Louis questioned plaintiff's credibility, stating "[t]he severity of the symptoms and the alleged effect on function is not entirely consistent with the total medical and nonmedical evidence . . . ." T. 605.

Plaintiff visited the Gulf Coast Medical Center on December 6, 2009, January 4, 2010, March 3, 2010, March 26, 2010, and April 28, 2010, complaining of abdominal and neck pain. T. 760-68, 777, 806. Plaintiff was diagnosed with chronic cervical herniated disc and chronic neck pain syndrome. T. 761. On May 28, 2010, plaintiff again visited the Gulf Coast Medical Center complaining of chronic neck pain that had increased over the past six months. T. 756. The attending emergency room physician, Dr. Kevin Willow, believed plaintiff had chronic cervical spine fracture with radiculopathy and "neuro deficit."[14] T. 757.

Plaintiff's primary care physician, Dr. Edwin Soto, completed a Medical Source Statement of Ability to Do Work-Related Activities on April 19, 2010. Dr. Soto recorded that plaintiff could "occasionally" and "frequently" lift less than ten pounds, stand and walk for less than two hours in an eight-hour work day, sit for less than six hours in an eight-hour work day, had to periodically alternate between sitting and standing, was limited in his lower extremities and ability to push and pull, and could not climb, kneel, crouch, crawl, or stoop. T. 659-60. On July 29, 2010,

---

[14] On June 28, 2010, claimant crashed his vehicle. T. 743. His lab reports, x-rays, and EKG were all negative and within normal limits. T. 744-54. Specifically, the x-rays of his lumbar and thoracic spine showed them to be within normal limits, and CT scans of his spine evidenced no acute fractures or subluxations and no focal disc herniation or cord impingement. T. 746-54.

claimant again visited Dr. Soto, who assessed cervical spine discogenic disease and hypertension. T. 846. Dr. Soto recorded a variety of medications, notably morphine taken orally three times a day and oxycodone with acetaminophen taken orally three times a day. T. 847. During a September 2, 2010 visit, Dr. Soto assessed cervical spine discogenic disease and hypertriglyceridemia (excessive serum triglyceride) and prescribed morphine to be taken orally three times a day and Percocet, also to be taken orally three times a day. T. 877.

Gastrointestinal Pain

On June 21, 2006, plaintiff saw Dr. Maciej Tumiel, a gastroenterologist, who noted that plaintiff's post cholecystectomy diarrhea had resolved. T. 1154. Beginning in March 2007, plaintiff visited Dr. Sudhakar Reddy with complaints of abdominal pain. T. 610-54. Plaintiff initially complained of severe diarrhea which caused him to have fifteen to sixteen bowel movements a day. T. 654. On April 10, 2007, Dr. Reddy noted that plaintiff's blood work and a CAT scan of his abdomen were essentially normal. T. 632. In subsequent follow-up visits, Dr. Reddy assessed chronic diarrhea and prescribed Lortab and Lotronex. T. 625-29. On January 16, 2008, plaintiff underwent a colonoscopy, which showed no abnormalities and appeared normal except for internal, non-bleeding hemorrhoids. T. 957-58.

On September 1, 2008, plaintiff visited Bay Medical Center, again complaining of abdominal pain. T. 439. Dr. Huan Vu believed the plaintiff's Crohn's disease was aggravated. T. 440. An abdominal x-ray revealed post-operative changes of the abdomen but "no sign of acute cardiopulmonary or intra-abdominal process." T. 441. CT scans of the abdomen and pelvis showed no acute abnormalities and no obvious inflammatory process. T. 435, 437, 739-40. X-rays of the abdomen and chest,

performed on March 26, 2010, showed functioning was within normal limits and a nonspecific bowel gas pattern. T. 765. Chest x-rays on March 3, 2010, showed a nonspecific bowel gas pattern and moderate stool; earlier X-rays on January 4, 2010 evidenced nonspecific, nonobstructive bowel gas pattern with no free air. T. 774, 783.

In a September 21, 2009 phone interview, claimant stated that his Crohn's disease was in remission but that he was still experiencing pain and weakness in his right shoulder and on the right side of his neck. T. 355. Plaintiff later stated that he only received pain treatment from the VA and had started taking morphine, which had greatly reduced his pain and allowed him to be more active, including doing light chores around the house and going out to dinner with his wife. T. 358.

On February 19, 2010, Mr. Laffon again visited Dr. Reddy, who indicated that the Pentasa and Remicade infusions had improved the diarrhea and abdominal pain "significantly." T. 610. Dr. Reddy also noted that the colonoscopy was normal, random biopsies were negative for microscopic colitis, and a small bowel capsule endoscopy showed no ulcerations in the small bowel. T. 610. During a telephone interview on June 7, 2010, claimant indicated the Remicade infusions were working very well and that he wished to keep Dr. Reddy as his primary gastroenterologist. T. 851. On July 29, 2010, Dr. Soto categorized the Crohn's disease as in remission. T. 844.

Hypertension

On July 3, 2008, Mr. Laffoon visited the Gulf Coast Medical Center with complaints of chest pain and was seen by Dr. Muhammad Mustafa. T. 411, 817. The plaintiff reported walking his dog "for about [one] mile," which was "usual for him,"

and experiencing left-sided chest pain after he arrived home. T. 413. At that point, plaintiff was taking Flexeril, Lopressor, Lotronex, Cymbalta, Effexor, and Buprenex. T. 413. Chest and neck x-rays were normal. T. 416-19. Dr. Mustafa diagnosed chest pain, hypertension, Crohn's disease, and chronic neck pain and recommended that plaintiff take baby aspirin and continue previously prescribed medications. T. 411.

Mr. Laffoon visited Bay Medical Center on July 9, 2008, again complaining of chest pain. T. 445. On October 3, 2008, he underwent left heart catheterization, left ventriculography, and coronary arteriograms. T. 431. Cardiologist Joey Trantham found no mitral regurgitation, no evidence of atherosclerotic coronary artery disease, and "minimal systolic narrowing in mid left anterior descending with apparently 'muscle bridge.'" T. 432. A chest x-ray was normal in light of the previous fusion surgery and showed no evidence of acute cardiopulmonary disease. Later x-rays of plaintiff's chest, taken on October 1, 2008, showed no signs of active chest disease or interval change. T. 433, 447. A chest x-ray on November 3, 2009, revealed no acute disease.

## ANALYSIS

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because five doctors opined that he was disabled and the ALJ: 1) overlooked the report and opinion of Dr. Shroff, who found the plaintiff unable to do sedentary work; 2) failed to consider the plaintiff's bilateral knee problems, bilateral shoulder problems, and elbow problems, individually and in combination with all of the plaintiff's other impairments; 3) erred by not including the side effects from plaintiff's various medications in the assessed RFC, particularly given that Drs. Jacob, Ghazi, and Shroff all believed the side effects were significant, even disabling;

4) erred in failing to include plaintiff's postural limitations, as assessed by Drs. Jacob and Ghazi, in the RFC assessment; and 5) failed to consult a vocational expert to address the assessed RFC limitations concerning plaintiff's ability to interact with the public and the side effects of plaintiff's medications. (Doc. 13, pp. 1-2).

As an initial matter, the undersigned notes that the ALJ discounted plaintiff's credibility concerning the "intensity, persistence, and limiting effects of his symptoms . . . ." T. 28. The ALJ explained that the objective evidence of record did not provide a "compelling basis" for claimant's statements concerning his limitations. T. 28. Indeed, the record contains numerous x-rays, MRIs, and scans, all of which consistently show mild to moderate findings inconsistent with plaintiff's claimed levels of limitation and pain. The ALJ noted the successful cervical fusion, which, according to Dr. Ghazi, should have alleviated any debilitating symptoms resulting from neck pain. T. 28, 48-50. Concerning his digestive complaints, plaintiff indicated that the Remicade infusions were working well and limited the gastrointestinal problems to once a week. T. 135-38. Dr. Ghazi expressed concern with the amount of opioids plaintiff was prescribed and found no orthopedic basis for claimant's complaints of pain. A number of other medical professionals who examined claimant's medical records questioned plaintiff's credibility and professed level of limitation. T. 49-50, 532, 539, 582, 594, 605. The record also contains various instances in which the plaintiff characterizes his abilities, including vacationing and walking his dog for approximately one mile each day. The ALJ's conclusion that the plaintiff's claims of limitation and pain are inconsistent with the

medical evidence of record, therefore, finds support in substantial evidence. [15]  T. 28-30.

<u>ALJ's Residual Functional Capacity Determination</u>

Turning to the parties' arguments, plaintiff contends in point four that the ALJ erred by concluding that he was capable of performing the full range of light work with the additional limitation that he was limited to no more than occasional interaction with people.  T. 27.  Specifically, plaintiff claims the ALJ should have included additional limitations concerning his ability to stoop and bend.  (Doc. 13, p. 12).  One might suspect, even with minimal medical evidence, that fusion of various portions of the spinal column would result in certain postural limitations.  The ALJ's assessed RFC, however, does not find plaintiff limited in any substantive postural manner.

Medical evidence as to this limitation does appear in the record.  At the hearing, Dr. Ghazi opined that the fusion would limit the motion of plaintiff's neck – in particular, the plaintiff's ability to bend his neck so that he could pull up his pants.  T. 72-73.  Dr. Newsom found limited range of motion in plaintiff's cervical and lumbar spine, T. 905; Dr. Shroff diagnosed limited range of motion of plaintiff's

---

[15] If the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain, she must do so explicitly and give reasons for her decision in that regard. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).   Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection, which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted).  And of course, the reasons articulated for disregarding the plaintiff's subjective complaints of pain must be based on substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

cervical spine with "moderately severe" functional loss due to pain," T. 928; Dr. Jacob noted that plaintiff could not walk tandem or straight leg raise above eighty degrees, had limited range of motion in his neck, and was limited to performing certain postural activities "occasionally" with difficulty due to medication and poor conditioning, T. 861; and Dr. Soto, plaintiff's treating physician, determined plaintiff was limited to "never" performing various postural activities during a four-month period. T. 660. Non-examining state agency consultants Donald Jay and Dr. Louis, however, found no postural limitations. T. 536, 602. Nevertheless, more than a modicum of evidence suggests plaintiff is limited in his neck to a greater extent than the assessed RFC. The ALJ does not account for any of these postural limitations in the RFC formulation and instead concludes plaintiff is capable of performing light work with only occasional public interaction. *See* 20 C.F.R. § 404.1545(a)(3) (noting that Commissioner must assess RFC "based on all the relevant medical evidence"). The reviewing court cannot say whether inclusion of such limitations ultimately would affect the RFC. The undersigned finds, however, that ALJ's RFC formulation, which fails to account for limitation of mobility of the spine, is not supported by substantial evidence of record.

<u>ALJ's Failure to Consider Plaintiff's Knee, Shoulder, and Elbow Impairments</u>

As guidance upon remand, the undersigned will address an additional and related point raised by the plaintiff. Plaintiff argues that the ALJ erred by failing to consider the knee, shoulder, and elbow impairments. (Doc. 13, p. 8). The Commissioner responds by noting that disability must be established under the Social Security Administration's rules and regulations, 20 C.F.R. § 404.1504, and that there was "no relevant evidence regarding these 'problems' that the ALJ failed to

consider." (Doc. 14, p. 11). The medical record in this case is expansive and spans well over a decade. Review of the medical record evidences that plaintiff has neither actively sought treatment for his knee, shoulder, or elbow impairments nor indicated that such conditions bothered him to a significant extent. Plaintiff sought treatment for neck and abdominal/gastrointestinal pain on a regular basis, yet never saw fit to seek treatment for his shoulder, knee, or elbow conditions. The objective evidence of record suggests that plaintiff's knee, shoulder, and elbow have not been of major concern. Nevertheless, plaintiff did complain of joint pain and weakness in his right shoulder. T. 309, 355.

Dr. Newsom's examination noted bilateral shoulder impingement and limitations on the range of motion, as well as crepitus in the left knee. Dr. Newsom also expressed an inability to properly examine plaintiff's right knee due to recent surgery. T. 898-908. Dr. Schroff diagnosed bilateral impingement syndrome in plaintiff's shoulders, classifying the functional loss from pain as "moderate." Schroff noted bilateral knee surgeries with a history of meniscectomies and characterized the functional loss in plaintiff's right knee as "moderate." T. 928. X-rays of plaintiff's left elbow showed "moderate" degenerative arthritic changes. Otherwise, objective findings from Drs. Newsom and Schroff did not indicate any abnormalities in that regard. T. 907. The ALJ did not discuss these various findings or the medical opinions which described them.[16] The mere existence of impairments does not necessarily establish work-related limitations. Absent any discussion by the ALJ, however, the reviewing court cannot reach that conclusion on its own. The ALJ is

---

[16] Whether the ALJ considered these ailments minor or inconsistent with the medical evidence in the record cannot be gleaned from the face of the ALJ's decision.

not obligated to refer to every piece of evidence and medical opinion, *Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 851 (11th Cir. 2006), but a complete failure to discuss impairments that could potentially lead to additional limitations on plaintiff's assessed RFC is of some concern.[17] *See Sneed v. Barnhart*, 214 F. App'x 883, 887 (11th Cir. 2006) ("When a claimant alleges several impairments, the ALJ has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. The ALJ can satisfy this duty by stating that he considered whether the claimant suffered from any impairment or combination of impairments.") (citations omitted). On remand, the ALJ should address any medically supported issues plaintiff alleges involving his knees, shoulders, or elbow. This directive, of course, should not be seen to foreshadow the ultimate treatment of these matters by the ALJ.

Finally, the undersigned notes that Mr. Laffoon has raised several points rendered moot by the findings contained in this Report and Recommendation. Nevertheless, the ALJ may find it useful to reconsider Dr. Shroff's opinion on remand, in light of the above findings. Because RFC, as formulated in the Decision on review, has now been rejected, the ALJ may find it appropriate to consult a vocational expert in lieu of reliance upon the grids. The ALJ also may consider plaintiff's position concerning the claimed disabling limitations resulting from

---

[17] The Commissioner cites *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007), for the proposition that the "mere existence of impairments does not establish significant work-related limitations for a continuous period of time." (Doc. 14, p. 10). The ALJ in *Despins*, however, appears to have at least addressed these minor impairments. 257 F. App'x at 930 (noting that the ALJ indicated "the administrative record contains no medical evidence indicating work-related limitations attributable" to plaintiff's minor heart impairment).

prescribed medications. The undersigned, however, advances no opinion as to a desired result concerning these matters.

It is therefore respectfully RECOMMENDED:

The applications for disability insurance benefits be remanded to the ALJ for further proceedings consistent with this Report and Recommendation.

At Pensacola, Florida, this 27th day of February, 2014.


/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).